UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____x

ANGELA DELEON, SUSAN JOHNSON, BARBARA
BLACK and J.H. on behalf of her minor child, T.H.,


                         Plaintiffs,


          - against -                              03 Civ. 10274 (CM)

PUTNAM VALLEY BOARD OF EDUCATION,

                         Defendant.


_____x

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

McMahon, J.:

          Plaintiffs are teachers, a prospective teacher, and a student in the Putnam Valley Central

School District ("PVCSD").  They bring this action for damages and injunctive relief against the

Putnam Valley Board of Education ("defendant"), alleging a variety of claims relating to

discriminatory hiring practices, intentional race discrimination, and retaliatory employment

action.  Plaintiff DeLeon, the only African-American teacher out of approximately 165 teachers

employed by the PVCSD, brings claims under the Equal Protection Clause of the Fourteenth

Amendment ("EPC") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title

VII"), alleging a denial of interracial association as a result of the district's discriminatory hiring

practices, disparate treatment, retaliation, and a racially hostile work environment.  Plaintiff

Johnson, a Caucasian teacher who formerly taught in the PVCSD, and who supported DeLeon in

her quest for a racially diverse work environment, brings a claim under the EPC, alleging denial

of interracial association and, it appears, retaliation.  Plaintiff Black, an African-American

teacher who applied for a job in the PVCSD and was not hired, brings claims under Title VII, the EPC, and 42 U.S.C. § 1981-a ("§ 1981"), alleging discriminatory hiring practices. Plaintiff T.H. (suing through her mother, J.H.), an African-American student in the PVCSD, who allegedly has suffered racial taunts by classmates and an unwarranted amount of discipline as compared to her white classmates, brings claims under the EPC and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), alleging intentional race discrimination.

Defendant moves for summary judgment, arguing, *inter alia*, that plaintiffs' claims are wholly unsupported by the evidence. Defendant asserts that the record establishes: (1) that the district employs a race-neutral hiring process, which neither intentionally discriminates against nor has a disparate impact on African-Americans, (2) that the PVCSD does not tolerate discrimination or racism, including any sort of disparity between whites and blacks in terms of discipline, and (3) that the district's actions with respect to each individual plaintiff were justified.

For the reasons discussed below, defendant's motion is denied with respect to Plaintiff DeLeon's hostile work environment claim; it is granted with respect to all other claims.

## Facts

The court begins by noting that plaintiffs have not complied with Local Rule 56.1 in opposing defendant's motion. Plaintiffs have submitted a response to defendant's 56.1 Statement, in which they deny most of the facts asserted by defendant. However, the majority of these denials are noted simply by the letter "D," and are not accompanied by citations to any evidence in the record. Plaintiffs also submit a counter-statement of facts, which is not keyed to defendant's statement of facts. At least 30 of the paragraphs in plaintiffs' counter-statement are

not supported by any citation to the record.

Local Rule 56.1(c) provides that all material facts set forth in the moving party's statement "will be deemed to be admitted unless controverted" by the non-moving party's statement. Pursuant to 56.1(d), ". . . each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible . . ." The purpose of the rule ". . . is to streamline the consideration of summary judgment motions by freeing district courts of the need to hunt through voluminous records without guidance from the parties." Holz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001). In other words, the rule exists so that busy trial courts confronted with mammoth motions (like this one) can (1) easily ascertain whether the parties agree about the existence of particular material facts, (2) readily compare alleged disputed issues of fact to determine whether they in fact clash (which is why responsive statements must be keyed to the movant's original statement), and (3) check the evidence in support of each side's clashing assertions to ascertain whether a disputed issue of fact exists. By failing to include citations to the record in its opposition to defendant's 56.1 Statement, but instead creating a 615-paragraph counter-statement of facts that is not keyed to defendant's statement, and that in many instances cites to nothing whatsoever in the record, plaintiffs have ignored both the letter and the spirit of the rule.

"The Court is permitted to disregard [] general denials when not supported by citations or if cited materials do not support factual assertions." Omnipoint Commc'n, Inc. v. City of White Plains, 175 F.Supp.2d 697, 700 (S.D.N.Y. 2001) (McMahon, J.), rev'd on other grounds, 2005 WL 3252342 (2d Cir. Dec. 2, 2005); see also Holtz, 258 F.3d at 73; Epstein v. Kemper Ins. Co., 210 F.Supp.2d 308, 314 (S.D.N.Y. 2002). Except for the few instances where plaintiffs raise a

genuine issue of fact by actually citing to evidence in the record to dispute a fact asserted by defendant, or by expressly disputing the meaning of a document cited by defendant, all of the facts contained in defendant's 56.1 Statement are deemed admitted. Only the following paragraphs of defendant's Statement are deemed controverted: 36, 37, 41, 106, 124, 125, 177, 180, 186, 199, 233-235, 238, 240, 281, 290-292, 302, 306, 326, 357, 360, 392, 404, 405.

The court also declines to accept any fact from plaintiffs' counter-statement that is not accompanied by a citation to the record. Accordingly, the following paragraphs of plaintiffs' Statement are stricken: 1, 4, 35, 42, 45, 67, 103, 104, 118, 34 (in part), 162-164, 174 (in part), 187, 221, 321, 327, 337, 346-349, 449, 454, 457, 490, 564, 575, 585, 614, 615.

The relevant facts that the court deems undisputed, based on the Complaint, the parties' 56.1 Statements (as limited by invocation of the Local Rule), and other materials submitted in connection with defendant's motion for summary judgment, are as follows:

Putnam Valley Central School District

The Putnam Valley Central School District is one of six school districts in Putnam County. (Def.'s 56.1 St. ¶ 89). During the five school years between 2000 and 2005, the PVCSD employed approximately 165 teachers, including one African-American and between one and eight Hispanic teachers. (Complaint ("Cplt.") ¶ 8; Def.'s 56.1 St. ¶ 98). During the same years, each of the other five school districts in the county employed between zero and two African-American teachers and between zero and two Hispanic teachers. (Def.'s 56.1 St. ¶¶ 93, 94, 95, 96, 97).

The PVCSD recruits applicants by advertising in various publications, including the *New York Times*, *Education Week*, the *Albany Times Union* and *The Journal News*. (Def.'s 56.1 St.

¶¶ 35, 37).  School administrators also attend recruitment fairs, some of which are aimed at minority recruitment.  (Def.'s 56.1 St. ¶¶ 62, 63, 64, 65).  At least one advertisement for minority applicants appeared in a predominantly African-American Baptist church.  (Def.'s 56.1 St. ¶ 48).

Until 2003, the hiring process in the PVCSD was as follows: upon receipt of resumes, the Central Office of the PVCSD input the names of applicants into a central database, and forwarded the resumes to administrators and/or principals of the schools with vacancies.  (Def.'s 56.1 St. ¶¶ 75, 76, 78).  The administrator and his/her staff reviewed the resumes and selected candidates for screening interviews by a hiring committee comprised of administrators, teachers and parents.  (Def.'s 56.1 St. ¶¶ 80, 84).  Application forms were not provided to applicants until after they submitted to the initial screening interview.  (Def.'s 56.1 St. ¶ 151).  The best candidates then were selected for a second interview with an expanded committee.  (Def.'s 56.1 St. ¶ 86).

In 2003, the process was changed.  School administrators still receive resumes as before, but now they conduct the initial screening interviews.  The candidates they select are then interviewed by the hiring committee.  (Def.'s 56.1 St. ¶ 88).

Plaintiff Angela DeLeon

Plaintiff Angela DeLeon is a third grade teacher in the Putnam Valley Elementary School (within the PVCSD).  (Cplt. ¶ 1; Def.'s 56.1 St. ¶ 1).  Throughout her thirteen year tenure, Ms. DeLeon has been the only African-American employed by the PVCSD, in either an instructional or administrative capacity.  (Cplt. ¶ 9).

In January 1998, DeLeon was appointed to be one of three teacher representatives on the board of the Northern Westchester Putnam Teachers Center ("NWPTC").  (Pl.'s 56.1 St. ¶ 318).

The president of the Putnam Valley Federation of Teachers, the local teachers union, is responsible for making such appointments. (Affirmation of Michael Sussman Ex. 47, 48). In March 2000, the Principal of the Putnam Valley Elementary School refused to allow DeLeon to attend a meeting of the NWPTC. (Pl.'s 56.1 St. ¶ 324). By a letter dated January 8, 2001, DeLeon was informed by the Middle School Principal that she was no longer a teacher representative on the NWPTC. (Pl.'s 56.1 St. ¶ 341; Affirmation of Michael Sussman Ex. 47).

On May 10, 2001, fifteen students complained to the Principal of the Elementary School that DeLeon had called a classmate of theirs a "dirty Irish Jew." (Pl.'s 56.1 St. ¶ 356). The Principal questioned DeLeon about the incident and DeLeon denied making any derogatory comments. (Pl.'s 56.1 St. ¶ 358). Following an investigation, the Principal concluded that the allegations were unsubstantiated. (Edelman Dep. at 36-37).

In April 2001, DeLeon and her counsel attended a meeting with the school Superintendent at which DeLeon voiced concern regarding the lack of minority teachers in the PVCSD. (Cplt. ¶ 11; Pl.'s 56.1 St. ¶ 26). The Superintendent stated that the school district was committed to hiring an increased number of African-American and minority teachers. (Cplt. ¶ 12; Pl.'s 56.1 St. ¶¶ 29, 30).

In mid-2002, DeLeon's attorney wrote two letters to the school district, reiterating DeLeon's concerns and seeking information on minority hires. (Cplt. ¶ 18; Pl.'s 56.1 St. ¶¶ 32, 33).

On January 9, 2003, DeLeon attended a meeting of third-grade teachers. (Def.'s 56.1 St. ¶ 269). During the meeting, an argument ensued between Plaintiffs Johnson and DeLeon and two of their colleagues, when the two colleagues criticized Johnson and DeLeon for isolating

themselves, not paying attention, and not participating in the meeting, and for repeatedly missing third grade faculty meetings. (Def.'s 56.1 St. ¶¶ 271- 277; Def.'s Ex. DDD). Nobody made any reference to race or made any racial remarks to DeLeon at the meeting. (Def.'s 56.1 St. ¶ 278). Nevertheless, DeLeon believed that she was subjected to discrimination and prejudice, and she and Johnson reported the incident to the Principal. (Def.'s 56.1 St. ¶¶ 269, 283). The Principal met with the teachers involved and concluded that the incident resulted from a professional difference of opinion. (Def.'s 56.1 St. ¶ 285).

During both the 2003-2004 and the 2004-2005 school years, DeLeon had more absences than any other teacher in her school. (Def.'s 56.1 St. ¶¶ 217, 219). In 2001-2002, she had 20.34 absences; in 2002-2003, she had 21.32 absences; in 2003-2004, she had 31.5 absences; in 2004-2005, she had 37.42 absences. (Def.'s 56.1 St. ¶¶ 212, 214, 216, 218). DeLeon's absences and frequent tardiness resulted in DeLeon's missing grade-level meetings, faculty meetings, staff development meetings, professional collaborative meetings, and conferences. (Def.'s 56.1 St. ¶¶ 220, 221, 241, 244, 251).

Following an absence on February 11, 2003, the Interim Principal wrote a memorandum to DeLeon regarding her failure to follow the procedure for notifying the school about an absence. (Def.'s 56.1 St. ¶ 225). Between October 2002 and March 2003, the Principal, the Interim Principal, and the Assistant to the Principal each wrote memoranda to DeLeon regarding her tardiness. (Def.'s 56.1 St. ¶¶ 243, 247, 249). DeLeon refused to attend a meeting about her tardiness upon a request from the Interim Principal. (Def.'s 56.1 St. ¶¶ 253, 254).

Aside from attendance and tardiness, Ms. DeLeon's evaluations have been positive. (Def.'s 56.1 St. ¶ 228).

Plaintiff Susan Johnson

Plaintiff Susan Johnson was an elementary school teacher in the PVCSD for nearly 25 years. (Cplt. ¶ 2; Def.'s 56.1 St. ¶ 156). She is Caucasian. (Cplt. ¶ 2).

Following the January 2003 meeting at which Johnson sided with DeLeon against two other third grade teachers, Johnson was assigned a number of difficult students. (Def.'s 56.1 St. ¶¶ 175, 178; Pl.'s 56.1 St. ¶ 397). She believes the placement of these students was designed to harass her and force her to retire, thus isolating DeLeon. (Pl.'s 56.1 St. ¶ 397). At least one of these students was ultimately removed from Johnson's class. (Def.'s Reply to Pl.'s 56.1 St. ¶ 397).

Johnson was reassigned from third grade to second grade for the 2003-2004 school year. (Def.'s 56.1 St. ¶ 202). Johnson had previously taught both second and third grade, and had listed third grade as her first choice and second grade as her second choice for that year. (Def.'s 56.1 St. ¶¶ 200, 201). Johnson believes that the transfer was punitive and aimed at severing her professional relationship with DeLeon. (Cplt. ¶ 23).

Johnson retired in 2004, after accepting a $30,000 retirement incentive. (Def.'s 56.1 St. ¶¶ 158, 159).

Plaintiff Barbara Black

Plaintiff Barbara Black is an African-American teacher, who applied for a position as an elementary school teacher with the PVCSD. (Cplt ¶ 3). When and how many times she applied are disputed. The Complaint alleges that Black sought and was denied a job in 2001. (Cplt. ¶¶ 13, 23). However, plaintiffs contend in their motion papers that Black applied annually between 2000 and 2003. (Pl.'s 56.1 St. ¶ 290). In making this assertion, the only evidence in the record

to which plaintiffs cite is a cover letter and resume, which are addressed not to the PVCSD, but rather to the Mahopac Central School District, in September 2001. (Affirmation of Michael Sussman Ex. 20). Defendant submits evidence that Black applied in 2003 (Def.'s 56.1 St. ¶¶ 126, 129), but denies that Black applied at any time prior to that year. (Def.'s 56.1 St. ¶ 127; Polewaski Aff. ¶ 7).

In 2003, there was only one teaching position available in the Putnam Valley Elementary School. (Def.'s 56.1 St. ¶ 132). Black was one of 600 candidates to apply for the position. (Def.'s 56.1 St. ¶ 133; Polewaski Aff. ¶ 8). All of the resumes submitted for the vacant position, including Black's, were sent to the Elementary School Principal. (Def.'s 56.1 St. ¶ 134; Polewaski Aff. ¶ 9). Black was not selected for an interview in 2003. (Def.'s 56.1 St. ¶¶ 149, 155). She never met with or spoke to any administrators in conjunction with her application for a teaching job in the Putnam Valley Elementary School. (Def.'s 56.1 St. ¶¶ 147). None of the PVCSD administrators knew Ms. Black's race. (Def.'s 56.1 St. ¶ 148).

Plaintiff T.H.

T.H. is an African-American student who moved to Putnam Valley in July 2001, and began attending the Putnam Valley Elementary School in second grade. (Cplt. ¶ 4; Def.'s 56.1 St. ¶¶ 321,322). It is unclear whether T.H. still attends school in the PVCSD.

In second grade, a fellow student teased T.H. about the color of her skin. (Def.'s 56.1 St. ¶ 345). None of T.H.'s teachers knew about this incident. (Def.'s 56.1 St. ¶ 347; T.H. Dep. at 16). None of her teachers said anything negative or derogatory to T.H. about her race or the color of her skin. (Def.'s 56.1 St. ¶ 349; T.H. Dep. at 17).

In fourth grade, another student made a derogatory racial comment to T.H. (Def.'s 56.1

St. ¶ 350). T.H. and her teacher both told the student to stop, and he did. (Def.'s 56.1 St. ¶¶ 350, 351; T.H. Dep. at 19-20).

Teachers and administrators have sent letters home to T.H.'s family regarding emotional and behavioral problems that T.H. exhibited at school. (Def.'s 56.1 St. ¶ 327). In second grade, T.H. ran away from school; in third grade she threatened to run away and commit suicide, claimed to have taken pills because she was angry, and fought with other students and grabbed another student's throat. (Def.'s 56.1 St. ¶¶ 328, 330, 335, 336, 355).

T.H. was suspended on one occasion, and she received a number of "Green Slips," or behavioral referrals. (Def.'s 56.1 St. ¶¶ 361, 373). She received the same number of Green Slips as one of her white classmates. (Def.'s 56.1 St. ¶ 367). Three other white students received as many, or more, Green Slips as T.H. (Def.'s 56.1 St. ¶¶ 363, 369, 370, 371).

### Standard of Review

A party is entitled to summary judgment pursuant to Rule 56 when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). Whether any disputed issue of fact exists is for the Court to determine. Balderman v. United States Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present

"specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation" and "must do more than simply show that there is some *metaphysical doubt* as to the material facts." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Matsushita Elec. Indus. Co., 475 U.S. at 586 (citations omitted). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson, 477 U.S. at 248.

## Conclusions of Law

The Complaint in this action is virtually unintelligible[1]– which is astonishing, since it was filed on the signature of a lawyer renowned for his ability, both by this court and by the Second Circuit. The only way to make sense of the pleading is to take each paragraph in which something resembling a claim is asserted and deal with that "claim."

A.  Paragraphs 20 and 26

Paragraph 20 alleges, "Defendant's intentionally discriminatory policy and practices have denied plaintiffs DeLeon and Johnson a racially diverse workplace and deprived them of inter-racial association in their employment." (Cplt. ¶ 20). Coupling this with Paragraph 26 – in which all plaintiffs assert some sort of Equal Protection violation, and in which DeLeon and Johnson specifically assert deprivation of a racially diverse group of peers – the court concludes that DeLeon and Johnson are alleging that they have been denied equal protection of the law due

---

[1]There is also no apparent reason why these claims were brought as one lawsuit, as no single cause of action is common to all four plaintiffs.

11

to a lack of a racially diverse workplace in the PVCSD.

This is precisely the same claim rejected in <u>Ad Hoc Committee of Concerned Teachers v. Greenburgh #11 Union Free School District</u>, 873 F.2d 25 (2d Cir. 1989). There, a committee of teachers alleged that the school district's intentionally discriminatory hiring practices "violate the Equal Protection rights of the Committee members in that they are deprived of the benefits of interracial association which, absent such discriminatory hiring, would be available to them." <u>Id</u>. at 27. The Second Circuit affirmed the district court's dismissal of the complaint for lack of standing, expressly holding that "deprivation of the benefits of interracial association has not been recognized, in and of itself, as an injury sufficiently 'direct and personal to satisfy the case or controversy requirement of Article III.'" <u>Id</u>. at 28 (citing <u>Warth v. Seldin</u>, 422 U.S. 490, 514 (1975)). Plaintiffs DeLeon and Johnson, like the Committee members in <u>Greenburgh</u>, "lack[] standing to litigate the injury . . . as alleged in the complaint." <u>Id</u>.

Plaintiffs argue that they are not "attempt[ing] to raise the putative rights of third parties," as was the case in <u>Greenburgh</u>, but rather that they personally suffered actual harm as a result of the racial homogeneity of the workplace. <u>Id</u>. However, the same was true of the plaintiffs in <u>Greenburgh</u>. Therefore, plaintiffs' attempt to distinguish their claim from the claim in <u>Greenburgh</u> is unavailing. Since this court must follow <u>Greenburgh</u>, this claim is dismissed.

B.      <u>Paragraphs 21, 23(c) and 26</u>

Plaintiffs allege that, "By failing to hire plaintiff Black on account of her race, defendants denied her the same employment opportunities it made available to less qualified Caucasians." (Cplt. ¶ 21). Black's failure to hire claim is asserted under three theories: Title VII, the EPC and § 1981.

1.    *Title VII*

        (a)    Time Bar

Insofar as Black claims a Title VII violation for the district's failure to hire her in any year prior to 2003, the claims are administratively unexhausted and time-barred.

The Complaint alleges that Plaintiff Black applied for, and was denied, a teaching position with defendant school district in 2001.  (Cplt. ¶¶ 13-14).  The Complaint further alleges that Black suffered economic loss after the district failed to hire her in 2001.  (Cplt. ¶ 23).  Nowhere does the Complaint allege that Ms. Black applied for and was denied a job at any time other than in 2001.  Nor has Black sought leave to amend the Complaint to allege such a claim.  Plaintiffs' motion papers, however, assert that Black applied to the PVCSD annually from 2000 through 2003, but was not hired.  As noted above, this claim is not supported by any citation to evidence in the record that demonstrates repeated applications.

Title VII requires that, before a lawsuit can be filed, an administrative charge must be filed with the Equal Employment Opportunity Commission ("EEOC") or an equivalent state or local agency, within 300 days of the alleged discriminatory act.  See 42 U.S.C. § 2000e-5(e)(1); Petrosino v. Bell Atl., 385 F.3d 210, 219 (2d Cir. 2004).  Plaintiff Black filed the only EEOC charge of which this court is aware on August 28, 2003.  In order to be timely under Title VII, any alleged discriminatory acts must have occurred no more than 300 days prior to the date the charge was filed– in this case, no earlier than November 1, 2002.  Obviously, a claim that plaintiff was not hired for the 2000-2001, 2001-2002, or 2002-2003 school years (the latter of which began in September 2002) is pleaded too late.

In her August 28, 2003, EEOC charge, plaintiff purports to rely on a "continuous action"

theory to bring in claims arising as early as July 2000 and as late as August 2003. However, refusal to hire claims are based on "discrete acts," each of which must fall within the limitations period. Petrosino, 385 F.3d at 220 (citing Nat'l R.R. Passenger Corp. v. Morgan, 526 U.S. 101, 114 (2002)). The only discrete act alleged in the charge that occurred within 300 days of the filing of the charge is the district's failure to hire Black for the 2003-2004 school year– a claim that was not pled in the Complaint. Black's effort to rely on some overarching and continuous policy of not hiring African-Americans does not save her individual Title VII claim from being time-barred insofar as it alleges a failure to hire prior to 2003.

Additionally, since Black does not allege that she filed charges within 300 days of being denied a job in 2000, 2001, or 2002, these claims have not been administratively exhausted.

(b)     No Disparate Impact

Had Black alleged a claim for failure to hire in 2003, her claim would be neither time-barred nor precluded for failure to exhaust administrative remedies. However, because the Complaint does not allege such a claim, and because the court is limited to the allegations in the Complaint, the court need not consider whether the district's failure to hire Black in 2003 violated Title VII or, more specifically, whether, as defendant contends, plaintiffs have failed to make out a *prima facie* case of disparate impact.

Even if the Complaint did allege (or was amended to allege) a Title VII claim for failure to hire in 2003, though, the claim would fail. Other than asserting that defendant's hiring system is racially flawed, plaintiffs do not identify some precise, facially neutral practice that has an adverse impact on African-Americans. See Smith v. Xerox Corp., 196 F.3d 358, 364 (2d Cir. 1999) (citing Griggs v. Duke Power Co., 401 U.S. 424, 430-32 (1971)).

A plaintiff may establish a *prima facie* case of disparate impact by showing that the use of a particular hiring practice causes the selection of applicants in a racial pattern that significantly differs from that of the pool of applicants.  Fickling v. New York State Dep't of Civil Serv., 909 F.Supp. 185, 188 (S.D.N.Y. 1995).  This showing may be made through the use of statistical evidence which discloses a disparity so great that it cannot reasonably be attributed to chance.  Id. (citing Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307-08 (1977)).

An absence of African-American teachers does not suffice to prove a *prima facie* case of discrimination without a comparison to the relevant labor pool.  See Jackson v. Univ. of New Haven, 228 F.Supp.2d 156, 166 (D.Conn. 2002) (citing Carter v. Ball, 33 F.3d 450 (4th Cir. 1994)).  Plaintiffs have failed to produce any evidence of the number of African-Americans in the hiring pool, which is essential to their case.

In Jackson, the court granted summary judgment on plaintiff's Title VII claim.  Id. While plaintiff submitted evidence about the small percentage of college coaches who are African-American, he failed to offer evidence about the number of African-Americans who were otherwise qualified for coaching positions but were not hired.  Id.

Here, plaintiffs emphasize that the PVCSD employs only one black teacher.  They also note that at least two other African-Americans, in addition to Plaintiff Black, applied to the school district but were not offered jobs.  However, plaintiffs offer no evidence about the number of qualified African-American teachers in the relevant labor pool– whether it be limited to Putnam County, as defendant suggests, or whether it "extends throughout the metropolitan area," as plaintiffs suggest.

Plaintiffs have provided evidence about the number of minority teachers who are

employed in Westchester County schools and in the Peekskill school district. (Pl.'s 56.1 St. ¶¶ 611, 612, 613). However, it is *African-American* teachers– not the broader category of *minority* teachers– that is relevant to our analysis. Moreover, this evidence only relates to the number of teachers *employed* in Westchester County and the Peekskill school district, not the number existing in the relevant labor pool. While plaintiffs throw in one sentence at the very end of their Reply to Defendant's 56.1 Statement, asserting that, "African-Americans make up approximately 15% of the teaching force in the relevant labor market, including New York City, Westchester and Putnam Counties," they cite no evidence to support this proposition. (Pl.'s 56.1 St. ¶ 615). Plaintiffs' unsupported statement does not comply with Local Rule 56.1(d), and therefore does not raise a *genuine* issue of material fact sufficient to defeat a motion for summary judgment. See Fed. R. Civ. P. 56(c); Danielak v. City of New York, 2005 WL 2347095, *5-6 (E.D.N.Y. Sept. 26, 2005).

Absent any evidence upon which a comparison can be made between the number of African-American teachers employed by defendant and the number in the relevant labor pool, no reasonable jury could conclude that defendant's hiring practices have a disparate impact on African-Americans in violation of Title VII.

2.      *EPC and § 1981*

Unlike Black's Title VII claim, her EPC and § 1981 claims need not be administratively exhausted and thus are not time-barred.

In order to establish an Equal Protection claim under the Fourteenth Amendment, "A plaintiff is required to show not only that the state action complained of had a disproportionate or discriminatory impact but also that the action was taken with *intent to discriminate*." United

States v. City of Yonkers, 96 F.3d 600, 611 (2d Cir. 1996) (emphasis added).  Likewise, in order

to prevail under § 1981, a plaintiff must demonstrate that defendant's acts are purposefully

discriminatory.  See Albert v. Carovano, 851 F.2d 561, 571 (2d Cir.1988).  This standard

". . . implies more than intent as volition or intent as awareness of consequences.  It implies that

the decisionmaker . . . selected or reaffirmed a particular course of action at least in part *because*

*of*, not merely in spite of, its adverse effects upon an identifiable group."  African American

Legal Def. Fund v. New York State Dep't of Ed., 8 F.Supp.2d 330, 337 (S.D.N.Y. 1998) (citing

Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979) (emphasis added).

Plaintiffs' argument rests on the fact that the PVCSD employs only one African-

American teacher and, allegedly, makes no effort to recruit African-American applicants.  While

it is undisputed that defendant advertises for applicants in the *New York Times*, plaintiffs

emphasize that the district has failed to advertise in periodicals and newspapers that target

minority communities.  Further, when the district does attract qualified minority applicants, such

as Plaintiff Black, the district allegedly opts not to extend offers to these candidates.

Contrary to what plaintiffs would have the court believe, the unrebutted evidence

demonstrates that defendant has advertised in a number of local and regional newspapers, that an

advertisement for minority applicants was sent to Ms. Black's predominantly African-American

Baptist church, and that district administrators have attended more than one minority recruiting

fair.  It also shows that the PVCSD employs an equal or greater number of African-Americans as

compared to the other five school districts in Putnam County (and actually employs a

significantly greater number of Hispanic teachers than the surrounding districts).

Moreover, while the district has declined to hire some African-American applicants

(including Ms. Black), plaintiff adduces no evidence of any intent to discriminate, as required to sustain a claim under the EPC and § 1981.

"[T]he court may not infer an intent to discriminate from awareness of allegedly detrimental effects alone." Grimes v. Sobol, 832 F.Supp. 704, 709 (S.D.N.Y. 1993). Accordingly, the fact that the district employs only one black teacher, and that Plaintiff Black was denied a job in 2003 (if not at other times as well), is insufficient to establish intent.

It is undisputed that defendant's administrators and personnel whittle down the applicant pool prior to meeting or otherwise learning the race of the individual applicants. Out of all of the applicants who submit resumes, only a limited number are chosen for screening interviews. (Def.'s 56.1 St. ¶ 80). Applicants are not even provided with application forms unless and until they have had a screening interview. (Def.'s 56.1 St. ¶ 151).

In 2003, Black was one of 600 applicants applying for a single teaching position. (Def.'s 56.1 St. ¶ 133). The Principal of the Putnam Valley Elementary School reviewed the resumes and chose ten applicants to interview. (Def.'s 56.1 St. ¶¶ 134, 135). Ms. Black was not one of them. (Def.'s 56.1 St. ¶ 149).

Black offers no evidence that the Principal who reviewed the files knew that she was African-American. Black's resume, which she submitted to the PVCSD in 2003, contains no information suggestive of her race. (Def.'s Ex. CC). Black never met with or spoke to any administrators in conjunction with her application for a teaching job in the PVCSD. (Def.'s 56.1 St. ¶¶ 146, 147). Indeed, plaintiffs admit that, "None of the PVCSD administrators had any knowledge of Barbara Black's race." (Def.'s 56.1 St. ¶ 148; Pl.'s 56.1 St. ¶ 148). Black testified at her deposition that the only reason she believed that race was a factor in the district's decision

to offer the job to another qualified candidate was the fact that the district advertised for minority applicants but did not contact her after she applied for an interview. (Def.'s Ex. M-5).

These undisputed facts belie plaintiffs' contention that Black was turned down for a teaching position *because of* her race. In light of the district's color-blind process, in which administrators have no way of knowing the race of the applicants when they select whom to interview, plaintiffs have failed to make a *prima facie* case, much less raise a triable question of fact on the issue of discriminatory intent.

C.      Paragraphs 22, 23(d) and 26

Plaintiffs allege that, "By failing to employ a racially diverse work force, plaintiffs subjected T.H. to racial discrimination in the terms and conditions of her public schooling, depriving her of equal educational opportunities." (Cplt. ¶ 22).

These claims are brought under both the EPC and Title VI. To prevail under either of these theories, T.H. must demonstrate discriminatory intent. African American Legal Def. Fund, 8 F.Supp.2d at 337; City of Yonkers, 96 F.3d at 611. She, like Black, raises no genuine issues of fact.

T.H.'s race discrimination claim initially rested, in part, on defendant's filing of two "false Child Protective Services reports." However, plaintiff T.H. no longer "rel[ies] on these as part of her evidence . . . and does not contend, for purposes of this motion, that said action creates an independently cognizable claim against the school district." (Opp. To Def.'s Mot. For Summ. J.[2]). The only remaining allegations of discrimination, therefore, relate to (1) the fact that

_____

[2]Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment does not contain page numbers. By my own count, however, this statement appears on page 32.

T.H. was taunted by other students on two occasions, and (2) T.H.'s allegations that she was disciplined excessively in comparison with Caucasian children.

The essence of T.H.'s claim with respect to derogatory comments is that, in second grade, another student made fun of the color of T.H.'s skin; and two years later, in fourth grade, another student called T.H. a derogatory name. The second grade incident was not witnessed by or reported to teachers or administrators, and T.H. testified at her deposition that "nobody really knew" about it. (Def.'s 56.1 St. ¶ 347; T.H. Dep. at 16). With respect to the incident in fourth grade, both T.H. and her teacher told the other student to stop making racial comments, and he did. (Def.'s 56.1 St. ¶ 350; T.H. Dep. at 19-20).

There is no evidence whatever in this record that defendant encouraged, condoned, or even turned a blind eye to the racial comments about which T.H. complains. T.H. does not allege that teachers or administrators ever made negative or derogatory comments to her about the color of her skin. (Def.'s 56.1 St. ¶ 349; T.H. Dep. at 17). While it is unfortunate that T.H. was twice subjected to taunts by her classmates, in the absence of any evidence of discriminatory intent, this claim does not survive summary judgment.

T.H. also alleges that she was disciplined more frequently than her white classmates. The record does not bear out this claim. In second through fourth grade, T.H. received one suspension and a number of "Green Slips," or behavioral referrals. Although T.H. testified that she received fewer than ten Green Slips in second grade (T.H. Dep. at 31), and DeLeon testified that she issued T.H. only one or two Green Slips when T.H. was in her third grade class (DeLeon Dep. at 283), the record does not include hard evidence of the exact number of Green Slips T.H. received during each of the relevant years. It does, however, contain evidence tending to negate

any inference that T.H. was disciplined more often that white students. Indeed, T.H. testified that she knew of several other students who received more Green Slips than she did. (Def.'s 56.1 St. ¶ 363). One particular Caucasian student received fourteen Green Slips during the 2002-2003 school year; another received nine; and yet another received five. (Def.'s 56.1 St. ¶¶ 369, 370, 371). Although T.H. did not believe that she deserved all the Green Slips she received, she did not believe that her Caucasian classmates deserved all of the Green Slips they received, either. (Def.'s 56.1 St. ¶ 362).

Moreover, the record contains no evidence that defendant intentionally disciplined T.H. without legitimate cause. For example, T.H.'s only suspension followed an incident where her teacher found a plastic knife in T.H.'s hand and blood on a classmate's neck. From this, the teacher concluded that T.H. had cut the other student's throat. (Def.'s 56.1 St. ¶¶ 375, 376; T.H. Dep. at 39-41). Though T.H. denied cutting her classmate when questioned at her deposition, she did not deny the allegations when she was sent to the Principal's office immediately following the incident. (Def.'s 56.1 St. ¶ 378; T.H. Dep. at 41). Additionally, T.H. received Green Slips or was otherwise "written up" for, among other things, being disruptive and misbehaving when she had a substitute teacher, getting in fights with other students, and repeatedly swinging from the bathroom stall. (DeLeon Dep. at 283-284; Def.'s Ex. MM). None of this behavior is controverted.

Based on the evidence in the record, no reasonable jury could conclude that defendant intentionally discriminated against T.H. on the basis of race, or created or maintained a racially hostile educational environment. While the court recognizes that the sort of incidents about which T.H. complains can be crushing to a child, two instances of name calling by seven and

nine year old children over a two year period is not sufficient evidence of intentional discrimination. That being so, T.H.'s contention that the lack of black teachers created an inherently discriminatory environment fails.

Moreover, to the extent that T.H.'s allegations of discrimination rest on the homogeneity of the district's workforce, her claim is essentially a <u>Greenburgh</u> claim, and thus is not cognizable (see discussion above).[3]

D.      <u>Paragraph 23(a)</u>

Plaintiff DeLeon alleges that, after complaining about the district's hiring practices, she has ". . . suffered disparate discipline, micro-management, been the subject of false, pejorative claims by administrators and has been denied the full and fair tangible benefits of her employment." (Cplt. ¶ 23).

Plaintiff may be asserting that she was subjected to disparate treatment in comparison to similarly situated white teachers in violation of the EPC, or that she suffered retaliation for the exercise of rights protected by Title VII. Alternatively, she could be claiming that she was subjected to a hostile work environment in violation of Title VII.

To the extent DeLeon attributes this alleged disparate treatment, retaliation, or hostile work environment to the district's "racial homogeneity," such claims are dismissed under <u>Greenburgh</u> (see discussion above).

1.      *Disparate Treatment*

---

[3]Defendant asserts that T.H., having moved out of Putnam Valley and withdrawn from the Putnam Valley Central School District, lacks standing to pursue the present action. Plaintiffs, on the other hand, contend that T.H. has re-enrolled in the school district, and continues to have a legally cognizable interest in the outcome of this matter. Because the court dismisses T.H.'s claims on other grounds, the court need not resolve this disputed issue of fact.

As discussed above, in order to establish an Equal Protection violation, DeLeon must demonstrate not only that she was selectively mistreated, but also that such selective mistreatment was motivated by an *intent to discriminate* on an impermissible basis, such as race. See Dawson v. County of Westchester, 351 F.Supp.2d 176, 194 (S.D.N.Y. 2004) (citing Crowley v. Courville, 76 F.3d 47, 52-53 (2d Cir. 1996)). While DeLeon need not show that a discriminatory reason was the only reason for the disparate treatment, she must show that it was a substantial or motivating reason. Id. (citing Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265-66 (1977)).

DeLeon's conclusory charges of racially "disparate discipline" are unavailing. Essentially, she argues that she is black, that she was disciplined, and therefore that she was the victim of racial discrimination. This is not a syllogism acceptable to this court.

While the evidence demonstrates that the incidents about which she complains indeed occurred, no admissible evidence has been offered to show that any of these incidents had any racially discriminatory character whatever.

For example, DeLeon claims that she received notations on her annual evaluations regarding her frequent absences and tardiness. This is true. However, DeLeon offers no evidence that she was not absent or tardy on the occasions when she received notations, or that any white teacher who was absent or tardy was not written up.

DeLeon claims that she was written up for leaving her class unsupervised. The evidence shows that she was, in fact, written up for leaving her classroom unattended. However, DeLeon offers no evidence that she was written up without justification, or that the administration was

aware of, but did not discipline, white teachers who left their classrooms unsupervised.[4]

DeLeon also complains that she was questioned by her Principal after students complained that she allegedly called one of their classmates a "dirty Irish Jew." (Edelman Dep. at 36). That the students made this complaint is undisputed. DeLeon does not indicate why it would have been inappropriate for the Principal to look into such an allegation; indeed, no Principal could possibly ignore such an allegation. Apparently the Principal did not did not credit the allegation since, after investigating, she took no disciplinary action against DeLeon, but rather punished the student who had started the rumor. (Edelman Dep. at 37). Moreover, DeLeon offers no evidence that the administration refused to investigate complaints about alleged racially or ethnically inappropriate behavior by white teachers.

DeLeon asserts that she was not permitted to place a book order that exceeded the approved budget. This too is true. However, DeLeon offers no evidence that white teachers were allowed to exceed their book budget while she was not.

Finally, DeLeon claims that, although she was a teacher representative on the board of the Northern Westchester Putnam Teachers Center at the time, the Principal refused to let her attend a NWPTC board meeting in March 2000. (Pl.'s 56.1 St. ¶¶ 318, 324). The evidence confirms that DeLeon was not permitted to participate in the March 2000 meeting. However,

---

[4]DeLeon alleges that, on one occasion, she peered into a white teacher's classroom and saw that it was unsupervised. This teacher was not written up. However, DeLeon offers no evidence that the administration was aware of this situation, and DeLeon admits that she did not so inform the Principal. (DeLeon Dep. at 580-583). Therefore, the court cannot rely on this allegation to conclude that DeLeon was disparately disciplined.

DeLeon offers no evidence tending to show that the Principal's decision was motivated by race.[5] She also asserts that, in January 2001, she was informed that she was no longer a member of the board. (Pl.'s 56.1 St. ¶ 341). The evidence confirms that DeLeon was replaced as a NWPTC teacher representative. But this was not done by defendant. DeLeon acknowledges that the president of the teachers union– not the school principal or other representative of the school district– is responsible for appointing teachers to the board. (DeLeon Dep. at 116, 121-122). She offers no evidence tending to show that defendant conspired with the teachers union to get her off the board, or that her removal was related to her race.

In short, no reasonable jury could conclude that DeLeon was treated any differently than white teachers who committed similar infractions, let alone that she was selectively mistreated *because of her race*.

2.    *Retaliation*

In order to establish a *prima facie* case of retaliation, an employee must show participation in a protected activity known to defendant, an adverse employment action, and a causal connection between the protected activity and the adverse employment action. See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (citing McMenemy v. City of Rochester, 241 F.3d 279, 282-3 (2d Cir. 2001). Moreover, to survive summary judgment, a plaintiff must present evidence that the alleged adverse employment action constituted a

---

[5]The Court went so far as to request from the parties citations to evidence in the record about the March 2000 incident. In response to the Court's letter, plaintiffs directed the Court to an excerpt from DeLeon's deposition transcript which addresses this incident. Neither her transcript nor any other evidence in the record, however, tends to show why DeLeon was not permitted to attend the meeting, or suggests in anyway that it was attributable to racial animus. (DeLeon Dep. at 120).

materially adverse change in the terms and conditions of employment.  Fairbrother v. Morrison,

412 F.3d 39, 56 (2d Cir. 2005); Sanders v. New York City Human Res. Admin., 361 F.3d 749,

755 (2d Cir. 2004).  To be materially adverse, the change must be "more disruptive than a mere

inconvenience or an alteration of job responsibilities."  Id. (quoting Terry v. Ashcroft, 336 F.3d

128, 138 (2d Cir. 2003)).  "Examples of materially adverse changes include 'termination of

employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a

material loss of benefits, significantly diminished material responsibilities, or other indices . . .

unique to a particular situation.'" Id.

DeLeon asserts that she was retaliated against for complaining about the district's hiring

practices and speaking out in favor of racial diversity.  Because plaintiffs have not briefed this

issue and do not plead specific incidents of retaliation or link dates and times of complaints to

subsequent instances of temporally-related retaliation, the court assumes that this claim rests on

the same incidents upon which DeLeon's claim of disparate treatment is based.

None of these incidents, however, constitutes retaliation in violation of Title VII.  For

example, the notations DeLeon received for misconduct that she actually committed, and the

investigation into a complaint actually lodged against her do not constitute materially adverse

changes in the terms and conditions of DeLeon's employment.

Similarly, the Principal's one-time refusal (for reasons unknown) to permit DeLeon to

attend a NWPTC meeting is not a "materially adverse change" in the terms and conditions of her

employment.  It does not appear to have altered the terms of her employment at all, let alone

materially altered it.  DeLeon's removal from the NWPTC board in January 2001, as noted

above, cannot be attributed to defendant.  Additionally, there is not a scintilla of evidence that

either of these incidents was linked, or causally connected, to DeLeon's criticism of the district's hiring practices. In fact, it was not until April 2001– three months <u>after</u> she was removed from the board and more than a year <u>after</u> she was barred from the meeting– that DeLeon and her counsel first met with the school Superintendent about the lack of minority teachers in the district. It was not until mid-2002– more than a year <u>after</u> she was removed from the board and more than two years <u>after</u> she was barred from the meeting– that DeLeon's counsel wrote two letters to the school district reiterating DeLeon's concerns. An action that takes place <u>before</u> protected activity cannot be retaliation for that protected activity.

Thus, no reasonable jury could conclude that DeLeon was subjected to materially adverse employment action because of, or in retaliation for, her criticism of the district's hiring practices.

3. *Hostile Work Environment*

Finally, DeLeon could be alleging a hostile work environment claim under Title VII.

A hostile work environment exists where the alleged harassment or objectionable conduct is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Fairbrother</u>, 412 F.3d at 48 (quoting <u>Alfano v. Costello</u>, 294 F.3d 365, 373 (2d Cir. 2002)). To defeat a motion for summary judgment on a hostile work environment claim, plaintiff must adduce evidence sufficient to permit a reasonable jury to conclude that the workplace was ". . . so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [] employment were thereby altered." <u>Id</u>. Simple teasing, offhand comments, or isolated incidents of offensive conduct will not support a hostile work environment claim. <u>Petrosino</u>, 385 F.3d at 224.

In determining whether the alleged harassment is of "such quality or quantity" as to meet

the "severe or pervasive" standard, courts consider the totality of the circumstances, including such factors as: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance. Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004) (citing Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999)). This test has both an objective and subject component: "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." Id. The plaintiff must also show that a specific basis exists for imputing the objectionable conduct to the employer. Fairbrother, 412 F.3d at 48-49.

DeLeon alleges that the incidents discussed above in the context of her disparate treatment and retaliation claims– including administrators' notations in her record regarding tardiness, absences and leaving her classroom unattended, the Principal's investigation into her allegedly derogatory comments to a student, the Principal's refusal to let her attend a NWPTC meeting, and her ultimate removal from the board– created a hostile work environment. These incidents, however, are too few and far between to constitute a hostile work environment. Also, the fact that DeLeon's tardiness and absences are undisputed, and that the Principal had an obligation to investigate a claim of derogatory comments by a teacher, eliminate these incidents from the equation. Moreover, as discussed above, because the president of the teachers union appoints teacher representatives to the board of the NWPTC, DeLeon's removal from the board cannot be attributed to defendant, and thus cannot be relied on as part of her hostile work environment claim.

DeLeon also alleges additional incidents in support of her hostile work environment claim. For example, she claims that the Principal of the Putnam Valley Elementary School, who is now deceased, joked about racial slurs that were written on the outside of the middle school and, on another occasion, remarked to DeLeon, "Could you ever see the day that a black person would ever be an administrator in Putnam Valley?" (Pl.'s 56.1 St. ¶¶ 311, 312). She claims that, in an effort to isolate DeLeon, Plaintiff Johnson (with whom DeLeon team-taught) was transferred to the second grade and assigned a disproportionate number of difficult students. DeLeon also alleges that a third grade colleague "verbally attacked plaintiff" during a third grade faculty meeting, creating a hostile work environment. Finally, DeLeon complains that third grade faculty meetings were always held in one particular teacher's classroom, and never in her room; that during meetings other teachers interrupted her or told her where to sit; that the intercom in her classroom, her walkie-talkie, and her computer did not work properly; that she was assigned a new student without prior notification; and that the Principal was noisy and rude during a classroom evaluation, and did not prepare a timely written evaluation.

"While a mild, isolated incident does not make a work environment hostile," and thus any one of these incidents considered independently may not satisfy the severe and pervasive standard, the court must consider the totality of the circumstances so that it may "obtain a realistic view of the work environment." Richardson v. New York State Dept. Of Corr. Serv., 180 F.3d 426, 437 (2d. Cir. 1999) (internal citations omitted). The record in support of DeLeon's hostile work environment claim is extremely thin. However, because it is conceivable that a jury could find that DeLeon was subjected to a hostile work environment, the court denies summary judgment on this claim.

E.    Paragraph 23(b)

Finally, plaintiffs allege that, "after associating professionally and personally for more than seven years with plaintiff DeLeon and speaking out in support of racial diversity in employment, in 2003, plaintiff Johnson suffered a punitive transfer aimed at severing her professional relationship with plaintiff DeLeon."  (Cplt. ¶ 23).

These allegations resemble a claim for retaliatory employment action.  However, Johnson offers no evidence that she ever filed a charge with the EEOC or received a "right to sue" letter, as required to bring a retaliation claim under Title VII.  See, e.g., Foxworth v. American Bible Soc'y, 2005 WL 1837504, *10 (S.D.N.Y. July 28, 2005).  Therefore, to the extent Johnson is alleging retaliation under Title VII, her claim is dismissed for failure to exhaust administrative remedies.

These allegations might also support a claim for retaliatory employment action under the First Amendment.  Of course, the Complaint does not specifically assert a claim under the First Amendment on Johnson's behalf, or mention 42 U.S.C. § 1983, the vehicle by which Johnson could have asserted such a claim.  Nor do plaintiffs brief this issue in their motion papers.  The court thus declines to read this claim into plaintiffs' Complaint.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part.

This constitutes the decision and order of the Court.

Dated: January 26, 2006

_____
U.S.D.J.

BY FAX TO ALL COUNSEL